IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GEORGE WASHINGTON

      v.

                          :   Civil Action No. DKC 14-0331

COASTAL INTERNATIONAL SECURITY

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this discrimination case are: (1) a motion to transfer the case filed by Plaintiff George Washington (ECF No. 44); and (2) a motion for summary judgment filed by Defendant Coastal International Security (ECF No. 31). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion to transfer will be denied. Defendant's motion for summary judgment will be granted.

## I.   Background

### A.   Factual Background

Unless otherwise noted, the following facts are undisputed. Coastal International Security, Inc. ("Coastal" or "Defendant") is a government contractor providing private security services to high-impact government agencies such as the Department of State, Homeland Security and Defense, and commercial organizations in the Baltimore-Washington area. (ECF No. 32-1,

at 2). Plaintiff George Washington ("Plaintiff" or "Mr. Washington") began working for Coastal in July of 2010 as an armed security officer. (ECF No. 32-3, at 9-10). One of Coastal's federal contracts involves providing armed security services at the White Oak facility, pursuant to a contract with the United States Department of Homeland Security-Federal Protective Services ("White Oak Contract"). (ECF No. 32-1, at 2, Caruso Affid. ¶ 3). Paul Caruso served as the Project Manager on the White Oak Contract. (*Id.* ¶ 4).

Plaintiff began working on the White Oak Contract specifically as an armed security guard in or around December 25, 2011. (*Id.* ¶ 5). Plaintiff is a war veteran and had to be available one weekend on a monthly basis to fulfill his military duties with the United States Navy Reserve. (ECF No. 32-3, at 13-14, Washington depo.). Mr. Caruso declares that after Plaintiff was assigned to the White Oak Contract, Plaintiff informed him about his weekend reserve obligations, at which point Mr. Caruso assured him that he would "direct [Plaintiff's] supervisors to always accommodate his schedule and ensure that he was given appropriate time off for any military leave." (ECF No. 32-1, at 3, Caruso Affid. ¶ 8). Employees on the White Oak Contract are instructed to coordinate their schedule and any military leave requests through their direct supervisors. (*Id.* ¶ 13). Lieutenants Christopher Jamison and Darrell Blaine

2

served as Plaintiff's direct supervisors on the White Oak
Contract. (*Id.* ¶ 14). Lieutenant Jamison previously served in
the military himself and was a member of the United States Air
Force. (*Id.* ¶ 15). Lieutenant Jamison currently serves as an
active member of the Army National Guard, and, like Plaintiff,
must be available for training and military duty on a monthly
basis. (*Id.*). Lieutenant Blaine also previously served in the
military and was a member of the United States Marine Corps.
(*Id.* ¶ 16). Mr. Caruso instructed Plaintiff to coordinate his
military leave schedule through Lieutenant Jamison. (*Id.* ¶ 17).
Mr. Caruso states that "[a]s a reflection of Coastal's
commitment to employing former and active members of the
military, [he] personally do[es] not ask those employees
identifying with the military and needing leave for military
purposes to provide [him] with their military orders confirming
their training." (*Id.* ¶ 10).

As the Project Manager, Mr. Caruso issued "any disciplinary
action [to] personnel on the White Oak contract including
issuing any verbal and written warnings, suspensions and
employee counseling letters." (*Id.* ¶ 20). "As a matter of
workplace policy, in the event that any of [Coastal's] employees
committed a workplace policy violation resulting in a
disciplinary action, [Coastal] writes up a Personnel Action
Report ("PAR"), which identifies the policy violated with a

description of the violation.  A PAR typically is supported by witness statements, approved by the employee's supervisor, and the employee is provided an opportunity to make a statement relating to the purported infraction." (*Id.* ¶ 21).  Throughout the course of his tenure with Coastal, Mr. Washington received six PARs. (*Id.* ¶ 22).

Plaintiff received his first PAR on February 3, 2012 for using unauthorized electronics while on duty to an assigned post in violation of the Security Guard Information Manual. (*Id.* ¶ 23; *see also* ECF No. 32-1, at 12-18).  Plaintiff asserts that he needed to request a restroom break "but could not remember the phone [number] to the Relief Guard[,]" which number was in the his cell phone. (ECF No. 32-1, at 13).  He was approached by Captain Saunders, who told him that cell phone use was prohibited.  After considering Plaintiff's explanation along with witness statements, Mr. Caruso suspended Plaintiff for three (3) days for this infraction. (ECF No. 32-1, at 5, Caruso Affid. ¶ 24).  On March 8, 2012, Mr. Washington received a second PAR for attempting to remove his gear before the end of his shift in violation of Coastal's Employee Handbook and the Security Guard Information Manual. (*Id.* ¶ 25; *see also* ECF No. 32-1, at 20-25).  According to this second PAR:

> On Thursday March 8, 2012 at approximately 07:55 AM, PSO Washington was in the security office attempting to disarm and go home. I

> (Lt. Somoza)[] informed PSO Washington that
> he could not disarm until 08[:]00.  PSO
> Washington stated that I was being petty and
> disarmed prior to 08[:]00.  PSO Washington
> disobeyed a direct order from a supervisor
> and falsified his time out on the 139.  PSO
> left post 12 prior to 08[:]00.

(ECF No. 32-1, at 20).  Plaintiff believes that he was given

conflicting orders because Lieutenant Rollins apparently

signaled to Plaintiff to "gear down."  (*Id.* at 24; *see also* ECF

No. 35, at 20, Washington Affid. ¶ 18).

Plaintiff was issued a third PAR on September 13, 2012 for

failing to follow a direct order to remain in the assigned area

of the post in violation of Coastal's Employee Handbook,

Coastal's Collective Bargaining Agreement, and the Security

Guard Information Manual.  (ECF No. 32-1, at 6, Caruso Affid. ¶

26; ECF No. 32-1, at 27-31).  According to this PAR, Plaintiff

was scheduled "at post 8 in building 22" and was "verbally

advised to remain in the lobby of building 22 unless on a

building tour which should be called in by phone or radio when

initiated."  (ECF No. 32-1, at 27).  The PAR states:

> P[SO] Washington, again on [September 13,
> 2012] [at 1:35 was] advised again that [he]
> should remain in the lobby of building 22
> after [Lieutenant Jamison] placed an
> accountability call to post and found
> [Plaintiff] missing.  P[SO] Washington was,
> again, missing from the lobby of building 22
> [at 2:11] when [Lieutenant Jamison] placed
> another officer accountability call.

(*Id.*).   Lieutenant  Jamison  sent  Plaintiff  home  after  the  third
PAR.    (Caruso  Affid.  ¶  27;  ECF  No.  32-1,  at  31).    Plaintiff
disputes  this  PAR,  stating:  "My  supervisor  directed  that  I
function  as  a  rover  whereas[]  I  was  subsequently  admonished  for
abandoning  the  post  assigned  by  another  []  line  supervisor."
(ECF No. 35, at 20, Washington Affid. ¶ 19).

On  September  13,  2012,  on  the  same  day  that  Plaintiff  was
issued  the  third  PAR,  he  presented  Mr.  Caruso  with  "an  apparent
letter  he  drafted  to  the  Department  of  Labor."   (Caruso  Affid.  ¶
28; *see also* ECF No. 32-1, at 33-34, letter).   The  letter  stated
that  Plaintiff  was  a  veteran  and  that  his  "employer  just
recently  terminated  [his]  employment  [for]  reasons  unknown."
(ECF  No.  32-1,  at  33).    Plaintiff  disputed  the  basis  for  the
third  PAR  and  requested  his  "full  pay  as  scheduled  and  the
return  to  [his]  schedule[d]  duties."   (*Id.*).   Mr.  Caruso  asserts
that  he  informed  Plaintiff  that  he  was  not  terminated,  "yet  told
him  he  is  free  to  pursue  his  claim  with  the  Department  of  Labor
if  he  so  wished.   I  also  informed  Washington  that  I  do  not  have
the  authority  to  make  termination  decisions,  further  confirming
to  Washington  that  he  was  not  terminated."   (Caruso  Affid.  ¶¶
30-31).   According  to  Mr.  Caruso,  upon  learning  that  he  was  not
terminated  but  sent  home  for  the  day  for  the  third  PAR,
Plaintiff  informed  Mr.  Caruso  "that  he  would  drop  his  complaint

with the Department of Labor," and the proposed letter was placed in Plaintiff's personnel file. (*Id.* ¶ 32).

On November 9, 2012, Plaintiff was issued a fourth PAR for failing to arrive to work on time in violation of Coastal's Employee Handbook, Coastal's Collective Bargaining Agreement, and the Security Guard Information Manual. (Caruso Affid. ¶ 36; *see also* ECF No. 32-1, at 36-38). In his affidavit, Plaintiff denies being late. (ECF No. 35, at 20, Washington Affid. ¶ 20). On November 22, 2012, Plaintiff received a fifth PAR "for engaging in insubordination after refusing to follow a direct order to move to a different post." (Caruso Affid. ¶ 37). The PAR explained:

> On [November 22, 2012] at approximately 06[:]15[,] PSO Washington was assigned to P08 0001-0800, [] Lieutenant Olajide[] gave him a direct order to sign out [from] post 8 and sign onto post 33, PSO Washington said, "No! I am not doing that; you need to find someone else." PSO Washington again was given a direct order stating what he needed to do and was also advised this was a **direct order.** I informed him the manner in which he was conducting himself was grounds for insubordination. He was informed he would be receiving disciplinary action. PSO Washington stated he did not care.

(ECF No. 32-1, at 40) (emphasis in original). Plaintiff contends that he was not insubordinate, but was "simply questioning the management's decision in this specific instance." (ECF No. 35, at 20-21, Washington Affid. ¶ 21). He

7

asserts that he was working two different posts that day, was ordered to report to a third post, and "previously had compensation issues and was shorted on money when working multiple posts during one duty shift." (*Id.*). After this fifth violation, Mr. Caruso again suspended Plaintiff for three days. (Caruso Affid. ¶ 38; ECF No. 32-1, at 46, official notice of suspension).

Thereafter, Mr. Caruso delivered a "letter of counseling" to Plaintiff on November 26, 2012. (ECF No. 32-1, at 49; Caruso Affid. ¶ 39). The letter stated, in relevant part:

> Please be advised that following instructions from a Supervisor is a critical part of an officer['s] task during their tour of duty. Under no circumstances is it acceptable to refuse to follow a supervisor's instruction or directive.

> From this point forward, you will be expected to immediately and strictly adhere to Coastal policies and procedures as well as applicable post orders. You are instructed to follow policies and procedures.

> This is a **Final Warning** that any future substantiated violations of any nature will result in the termination of your employment with Coastal International Security, Inc.

(ECF No. 32-1, at 49) (emphasis in original). Mr. Caruso declares that when he presented this letter to Plaintiff, he specifically informed him "that this was final warning and that any future policy violations would result in his immediate

termination." (Caruso Affid. ¶ 40). Plaintiff signed and dated the letter and acknowledged his understanding of its contents. (*Id.* ¶ 41; *see also* ECF No. 31-2, at 49).

On April 28, 2013, Mr. Washington received a sixth PAR for failing to wear a proper ballistic vest. (Caruso Affid. ¶ 43; ECF No. 32-1, at 51-58). According to the PAR, Mr. Washington worked the entire shift without wearing his protective vest, "endangering [himself], co-workers, and the client that [he was] there to protect." (ECF NO. 32-1, at 51). Plaintiff admits that he failed "to insert the back plate of his bullet proof vest or body armor," but states that it was "simply an oversight." (ECF No. 35, at 21, Washington Affid. ¶ 22).

After Plaintiff received a sixth PAR, Mr. Caruso requested from Coastal's Human Resources Department that Plaintiff be removed permanently from the White Oak Contract. (Caruso Affid. ¶ 44; *see also* ECF No. 32-1, at 60). Janet Gunn, the Vice President of Human Resources for Coastal, provided a declaration stating: "[i]n the event a Program Manager makes a recommendation for termination, Human Resources, at my direction, conducts a review of the matter including the employee's personnel history, taking into consideration the number of policy violations, the severity of the violation(s), the duration between policy violations, and whether or not the

employee was provided a final warning." (ECF No. 32-2, at 5, Gunn Affid. ¶ 16). Ms. Gunn further declared:

> 17. On April 29, 2013, Paul Caruso, Project Manager on the White Oak Contract, made a formal recommendation for Washington to be terminated in light of the six policy violations committed in a fourteenth month period. Exhibit F.
>
> 18. Upon receiving this recommendation, my office conducted a review to assess whether or not to terminate Washington.
>
> 19. After conducting such a review, consulting with Washington's supervisors, reviewing the six (6) Personnel Action Reports issued to Washington in a 14-month span, along with the supporting witness statements, resulting in two three (3) day suspensions, as well as a final warning notifying him that any subsequent violation would result in his termination, I made the decision to terminate Washington.

(*Id.* ¶¶ 17-19).

On June 5, 2013, based on the results of the investigation, Ms. Gunn terminated Plaintiff from Coastal. (ECF No. 32-1, at 9, Caruso Affid. ¶ 46). The termination letter delivered to Plaintiff stated, in relevant part: "Based on the results of an investigation into your recent actions, Coastal has lost confidence in your ability to properly carry out your duties as an Armed Security Officer and comply with all policies and procedures." (ECF No. 32-2, at 31).

## B.    Procedural Background

On August 7, 2013, Plaintiff, proceeding *pro se*,[1] commenced this action in the United States District Court for the District of Columbia against Defendants and Nicholas V. Christiansen, Sr. Coastal responded by moving to dismiss or to transfer venue.  By a memorandum opinion and order issued on January 10, 2014, Judge Bates transferred the case to this court.

Plaintiff failed to respond to an order to show cause as to why Defendant Christiansen, Sr. should not be dismissed because Plaintiff failed to effect service on him within the requisite time period.   The claims against Mr. Christiansen, Sr. were dismissed.  (ECF No. 20).  After discovery concluded, Defendant moved for summary judgment on November 24, 2014.  Plaintiff opposed the motion, (ECF No. 35), and Defendant replied (ECF No. 37).   Then, Plaintiff, proceeding *pro se* and without his attorney's authorization, filed two motions to transfer this case to the Northern Division, which were denied on February 5, 2015.  (ECF No. 41).  Subsequently, Plaintiff filed yet another motion seeking to transfer the case to the Northern Division, (ECF No. 44), which Defendant opposes (ECF No. 45).

---

[1] Plaintiff has since retained counsel.

## II.  Analysis

### A.   Plaintiff's Motion to Transfer

Plaintiff has again moved – this time through his attorney – to transfer this case to the Northern Division.  (ECF No. 44).  Plaintiff's attorney states:

> 2.  Mr. Washington has conveyed to the undersigned that he does not believe that he can receive a fair trial in Greenbelt and believes he will receive a fair trial in Baltimore.  Greenbelt and Baltimore are both divisions within the same court.  The plaintiff and the undersigned are quite aware that this matter has been previously [] ruled on by this court.  Mr. Washington is adamant that had the undersigned drafted this request for a change from the Southern Division sitting in Greenbelt, Md., to the Northern Division sitting in Baltimore that the result would have been different. . . .

> 3.  Mr. Washington believes he has experienced a history of unfair treatment and litigation failures at the court in Greenbelt and believes that a history of litigation failures will serve as a precursor to a similar result in this instance and therefore wishes for this matter to be transferred to the court in Baltimore.

(ECF No. 44, at 1-2).[2]  Defendant opposes transfer, contending that Plaintiff has filed this motion as another attempt to delay progress of this case and has not provided any basis warranting

---

[2]  The CM/ECF system reflects eight other cases filed by Plaintiff, six of which were handled by four other judges in the Southern Division and two by judges sitting in the Northern Division.  This is the first case involving Plaintiff assigned to this member of the bench.

reconsideration of the court's denial of his prior requests to transfer.

Plaintiff's motion to transfer his case to the Northern Division will be denied.   As explained in the February 5, 2015 opinion:

> The District of Maryland has two divisions – Northern and Southern – sitting in Baltimore and Greenbelt, respectively. The Southern Division includes the counties of Calvert, Charles, St. Mary's, Montgomery, and Prince George's.   Because Plaintiff lives in Prince George's County and Defendant Coastal International Security is a company located in Prince George's County, the matter is properly before the Southern Division and Plaintiff's motions will be denied.

(ECF No. 41, at 2-3).   Plaintiff has provided no basis to warrant transfer of this case and his motion will be denied.[3]

### B.   Defendant's Motion for Summary Judgment

### 1.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322

---

[3] In a single sentence in the motion to transfer the case to the Northern Division, Plaintiff's attorney indicates that his client requests a trial by jury.   It does not appear that Plaintiff made a demand for a jury trial when he first filed his complaint in the District of Columbia.   Because summary judgment will be granted to Defendant, the request for a jury trial need not be considered.

(1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment.  *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  *Matsushita Elec.*

*Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment.  *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

2.   **USERRA**

Plaintiff was proceeding *pro se* at the time he filed his complaint, which is a far cry from a model of clarity. Plaintiff alleged in his complaint that Defendant discriminated against him on the basis of his military status when he was terminated in July 2013.  In the motion for summary judgment, Defendant construed Plaintiff as having asserted a retaliation claim under the USERRA, presumably because Plaintiff at some point threatened to (or actually did) complain to the Department

15

of Labor.     As the case evolved, however, it appears that Plaintiff is asserting a discriminatory termination claim under the USERRA, rather than retaliation, as he does not rely on the Department of Labor letter as a basis for his claim.

The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), enacted in 1994 to improve the Veterans' Reemployment Rights Act, "prohibit[s] discrimination against persons because of their service in the uniformed services." *Hill v. Michelin North Am., Inc.*, 252 F.3d 307, 311 (4th Cir. 2001) (internal quotation marks omitted).   The USERRA provides in relevant part:

> A person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . or obligation.

38 U.S.C. § 4311(a).   The statute further elaborates:

> An employer shall be considered to have engaged in action prohibited . . . under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership.

38 U.S.C. § 4311(c)(1).[4]

---

[4] The Supreme Court of the United States has stated that the USERRA is "very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is

"In a USERRA case, 'there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" *Bunting v. Town of Ocean City*, 409 F.App'x 693, 695 (4th Cir. 2011) (*quoting Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed.Cir. 2001)).  The Fourth Circuit explained in *Bunting*, 409 F.App'x at 695-96, that "[t]o establish a certain factor as a motivating factor, a claimant need not show that it was the sole cause of the employment action, but rather that it is one of the factors that a truthful employer would list if asked for the reasons for its decision."   "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (*quoting Brandsasse v. City of Suffolk, Va.*, 72 F.Supp.2d 608, 617 (E.D.Va. 1999)).   "Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Hill*, 252 F.3d at 312-13.

---

established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (*quoting* 42 U.S.C. §§ 2000e-2(a), (m)).

Defendant argues that Plaintiff cannot maintain his claim because: (1) he cannot establish that his military service was a motivating factor behind Defendant's decision to terminate him, or if he can, (2) Defendant can establish that it would have terminated Plaintiff for valid reasons independent of his military service, namely Plaintiff's accumulation of six PARs.

A court may infer discriminatory motivation under the USERRA from direct or circumstantial evidence. *Sheehan*, 240 F.3d at 1014 ("Circumstantial evidence will often be a factor in [USERRA] cases, for discrimination is seldom open or notorious."). The court in *Sheehan* explained that discriminatory motivation under the USERRA may be inferred from a variety of factors, such as:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

"In determining whether the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered, including the agency's explanation for the actions taken." *Sheehan,* 240 F.3d at 1014.

Plaintiff does not expressly identify the factor(s) on which he relies.   Based on the following contentions in Plaintiff's affidavit, which he signed but not under penalty of perjury, it appears that he attempts to show hostility by Coastal toward military service members:[5]

> 10. It was my practice to supply Coastal with my Naval Reserve Schedule supplied to me by the Navy several months in advance.
>
> 11. I passed the same to my supervisors and schedulers.
>
> 12. I came to learn that this monthly weekend schedule caused Coastal management coverage and scheduling problems.   Further, I came to learn that Coastal management regularly neglected to keep account of my schedule and that they would regularly schedule me for work sessions in conflict with my Naval Reserve dates.
>
> 13. When I raised such scheduling conflicts with management I was consistently met with stern and rebuking gestures by management. In short, I would notify management that I had been scheduled for a weekend duty assignment which was incompatible with my Navy reserve schedule and when this occurred, which was often, I was consistently and sharply rebuked in such instances and told that I was causing

---

[5] Although Defendant objects to a statement contained in Plaintiff's affidavit on admissibility grounds, Defendant has not challenged the admissibility of Plaintiff's affidavit for not having been signed under penalty of perjury. *See Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F.Supp.2d 470, 473 n.2 (D.Md. 2013) ("Here, neither party has objected that the materials contained in the record are not capable of being submitted in admissible form.   Thus, the court will exercise its discretion to consider these documents as being what they are purported to be.").

> scheduling problems for Coastal and causing
> them to be shorthanded.
>
> 14. My contact was with the supervisors on
> the job site and not with upper management.
> This scheduling and coverage issue[s]
> [caused] stress between myself and
> management.
> . . .
>
> 23. I was told by line management, in the
> persons of Lt. Sims, that the weekend
> reserve duty was a major problem for
> management.

(ECF No. 35, at 19-21, Washington Affid.). Plaintiff clarifies
in his opposition that "line management" refers to "the field
supervisors in place and at the job site at the White Oak
facility." (*Id.* at 11 n.2). He also clarifies in his
opposition that Lieutenant Julius Sims served as his weekend
supervisor for the White Oak facility, and that Lieutenant Sims
regularly assigned him weekend duty that conflicted with his
Reserve obligations. (*Id.* at 13).

Plaintiff's affidavit conveniently omits supporting facts
to provide a frame of reference for his assertions.
Specifically, nowhere in his affidavit does Plaintiff specify
the time frame for when purportedly he received "rebuking
gestures," nor does he clearly delineate who in "management"
"sharply rebuked him" for having monthly commitments to the
Reserve, and how. Moreover, Plaintiff states in his memorandum
in the opposition to the motion for summary judgment, but *not* in

his affidavit, that "Mr. Washington was advised by Lt. Sims that he would be disciplined and ultimately terminated for the conflicts his reserve[] duties caused management in trying to schedule weekend guard assignment." (ECF No. 35, at 13).

Putting aside any admissibility issues with the statements purportedly made by Lieutenant Sims, Plaintiff's "evidence" of hostility from Coastal towards his military membership is problematic. Indeed, Plaintiff acknowledged during his deposition that Coastal never denied him leave to fulfill his monthly obligations to the Reserve. (ECF No. 32-3, at 15); *Rademacher v. HME Corp.*, 645 F.3d 1005, 1011 (8th Cir. 2011) ("The frustration Kummer expressed about Rademacher's enlistment in 2003, without more, is insufficient to support an inference that Rademacher's membership in the Air Force Reserves was a motivating factor in HBE's decision to discharge him."). Although he asserts that occasionally Lieutenant Sims scheduled him to work at Coastal during the same weekends that he had Reserve obligations, he does not dispute that Coastal always corrected the schedule. (ECF No. 32-3, at 16). Moreover, Mr. Caruso declared that employees on the White Oak Contract were instructed to coordinate their military leave requests through their *direct supervisors* and that Plaintiff's direct supervisors on the White Oak Contract were Lieutenant Jamison and Blaine, both of whom previously served in the military. (Caruso Affid.

21

¶¶ 13-16).  Much like Plaintiff, Lieutenant Jamison himself had to be available for training and military duty on a monthly basis.  (*Id.* ¶ 15); *see, e.g., Easton v. Continental Tire North Am., Inc.*, No. 05-CV-4039-JPG, 2006 WL 1004887, at *6 (S.D.Ill. Apr. 17, 2006) ("At the most basic level, it is hard to give credence to an inference of CTNA's discrimination against those in the military when its personnel manager is a former military man himself").

Mr. Caruso also declares in his affidavit that "[d]uring Washington's tenure with Coastal, and on the White Oak Contract alone, Coastal employed seven (7) other armed security guards who were also active members of the military reserve," and that at the time of Plaintiff's termination, there were approximately 186 identified veterans employed by Defendant.  (ECF No. 32-1, at 3, Caruso Affid. ¶ 11; ECF No. 32-2, at 6, Gunn. Affid. ¶¶ 27-28); *see, e.g., Easton*, 2006 WL 1004887, at *6 ("If Gass did not hire Easton because of his Guard membership, it would defy reason that he would hire another Guard member with similar commitments in his stead.  Furthermore, CTNA's hiring of three additional members of the Guard, Hood, Childers and May, supports CTNA's version of events.  CTNA allowed all of these workers to miss work to meet their obligations with the Guard.").  Plaintiff has fallen far short of establishing that his military reserve status and resulting monthly obligation

played any role – much less a motivating role – in his termination. The organization generally was, if anything, welcoming to reservists. Plaintiff has provided no evidence that he was disciplined more harshly for similar misconduct than others outside of his protected class (*i.e.,* non-reservists).

In any event, Defendant has established that it would have terminated Plaintiff regardless of his military service. "If the employee establishes that his military status was a motivating factor in the employer's decision, the USERRA then shifts the burden of proof to the employer, allowing the employer to avoid liability only if 'the employer can prove that the action would have been taken in the absence of' the employee's military status." *Hill*, 252 F.3d at 312 (*quoting* 38 U.S.C. § 4311(c)(1)). Plaintiff acknowledged that he received Coastal's Employee Handbook and "agree[d] to comply with the policies, rules and regulations stated in the Handbook or otherwise established orally and in writing." (ECF No. 32-2, at 9). Among other things, the Handbook provides that dismissal "is appropriate for a serious violation of rules or standards of conduct. *Also, dismissal may result from repeated offenses.* Depending upon the seriousness of the violation, dismissal may follow warnings or suspensions or be the initial disciplinary action itself." (*Id.* at 13) (emphasis added). Grounds for *immediate dismissal* include refusal to work, insubordination,

and leaving post without being properly relieved. (*Id.*).
Defendant's Collective Bargaining Agreement and the Security
Guard Information Manual further prohibit certain conduct,
including insubordination, use of a personal cellular telephone,
and disregarding orders. (*Id.* at 16-27).

As detailed above, Plaintiff received six PAR's and was
suspended twice. The fact that Plaintiff thinks Defendant could
have turned a blind eye to these violations does not mean that
the termination was motivated by his military involvement. *See,
e.g., Snowman v. IMCO Recycling, Inc.*, 347 F.Supp.2d 338, 344-45
(E.D.Tex. 2004) (subjective belief and speculation cannot
establish a genuine issue of material fact regarding
discrimination under the USERRA). The analysis undertaken by
the Fourth Circuit in *Francis v. Booz, Allen & Hamilton, Inc.*,
452 F.3d 299, 308 (4th Cir. 2006), applies here:

> In this case, the evidence of Francis'
> misconduct at BAH is overwhelming and
> largely uncontroverted. She arrived late
> for work and left early without permission.
> She missed scheduled conference calls. She
> acted inappropriately to customers and co-
> workers - engendering complaints about her
> behavior and professional attitude from
> several of the latter. She left her work
> station without permission. Supervisors
> found her to be evasive, non-responsive, and
> uncommunicative.
>
> Francis does submit an affidavit in the
> record in which she indicates that she
> believed that she was acting professionally
> and in accordance with the Core Values

24

> during her time at BAH. . . .  Even viewing
> this affidavit in the light most favorable
> to Francis, however, it does not create a
> dispute of material fact sufficient to
> survive summary judgment.  The operative
> legal question is not whether Francis
> believed that her dismissal was reasonable
> or that she was acting professionally.  The
> operative question is whether, based on the
> undisputed evidence in the record, it was
> objectively reasonable for BAH to dismiss
> Francis.  In this case, the undisputed
> evidence indicates an extensive pattern of
> unprofessional misconduct taking place over
> the course of years, well documented by BAH,
> and reported to BAH management from a wide
> variety of co-workers and other sources.
> *This pattern of misconduct provides a*
> *sufficient legal basis to justify Francis'*
> *dismissal – despite Francis' subjective*
> *views of her actions.  See generally*
> *Goldberg v. B. Green & Co., Inc.*, 836 F.2d
> 845, 848 (4th Cir. 1988) (noting that
> opinions and conclusory assertions are not
> sufficient to survive summary judgment).

(emphasis added).

Plaintiff received a final warning after his fifth PAR,
putting him on notice that "any future substantiated violations
of any nature will result in the termination of [his]
employment." (ECF No. 32-1, at 49).  Plaintiff does not dispute
that the sixth PAR – issued as a result of his failure to insert
the back plate of his bulletproof vest – was warranted, but
attempts to minimize it as a mere "oversight." (ECF No. 35, at
21, Washington Affid. ¶ 22).  Plaintiff gave the following
deposition testimony:

Q: That was your final warning.  Do you recall that?

A: I recall that.

Q: And you recall Coastal specifically said, any subsequent violations will result in termination.  You recall that, right?

A: Yes.  Yes.

Q: And Coastal believed that you committed a violation when you failed to wear your uniform, right?

A: Yes.

Q: And you admit that you failed to wear proper uniform that day, right?

A: Yes.

Q: So that's a violation of company policy, right?

A: It is.  Okay.

Q: And you were aware of the fact that any subsequent violations would result in termination, right?

A: Yes.

(ECF No. 32-3, at 44-45).  Consistent with the admonition in the final warning that Coastal provided to Plaintiff on November 26, 2012, Mr. Caruso recommended that Plaintiff be terminated after his sixth PAR.  After Ms. Gunn conducted an investigation, she agreed that Mr. Washington should be terminated.  Although Plaintiff may characterize his workplace violations as "petty" and unwarranted, it is not the court's role to second-guess the

employer's disciplinary decisions under these circumstances. *Hill*, 252 F.3d at 315 ("Hill's complaints about the way the investigation was conducted and the result of the investigation are insufficient to create a genuine issue of material fact as to the relevant questions – whether Michelin determined that Hill's actions were intentional and whether Michelin consistently terminates employees who intentionally falsify their time cards."); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (internal quotation marks omitted)).

Based on the foregoing, Defendant carried its burden of proving that it would have terminated Plaintiff because of the six PAR's without regard to his Reserve status.   Accordingly, summary judgment will be granted to Defendant.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion to transfer will be denied.  Defendant's motion for summary judgment will be granted.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
